# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

CHARLENE ALLAIRE,

           Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY,

           Defendant.

No. 18-CV-60-LRR-KEM

**REPORT AND RECOMMENDATION**

---

Plaintiff Charlene Allaire seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her applications for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Allaire argues that the ALJ erred by failing to consider whether her impairments met or equaled Listing 12.15, by assigning minimal weight to the medical opinions of her treating providers and the consultative examiner, and by formulating an inaccurate hypothetical for the vocational expert (VE). I recommend **reversing** the Commissioner's decision and remanding for an award of benefits.

## I.     BACKGROUND[1]

Over the years, prior to Allaire's alleged disability onset date, she has been steadily employed. *See* AR 328. She worked as a sales associate in a department store for more than fifteen years and testified that she left that job in 2008 because it was getting difficult

---

[1] For a more thorough overview, see the Joint Statement of Facts (Doc. 9).

to be on her feet all day as she got older (Allaire was born in 1966). AR 69, 328. She then worked as a bank teller for a year and went to school to become a medical assistant. AR 328, 1224. In April 2010, she put her schooling to use and began working in a group home, assisting people with disabilities in their activities of daily living. AR 67, 328.

Allaire's difficulties began in November 2011 after a resident of the group home she worked at head-butted her twice in the head, with enough force that it gave Allaire a concussion. AR 462. She could not work for a month and a half due to dizziness and nausea symptoms caused by the concussion. AR 462-64. A doctor cleared her to go back to work with restrictions in early January 2012, but her symptoms still caused her to be unable to work some days, and the group home terminated her employment in early March 2012. AR 328, 464-67, 962-63. She found work in September 2012 as a nursing assistant at a hospital, drawing blood and taking vitals, but testified that her dizziness and other symptoms still limited her abilities and that she was "forced out" in October 2013 and ultimately fired in early 2014. AR 68, 328; *see also* 1276 (Allaire told providers in July 2013 that her impairments had caused her to miss a lot of work recently and that she struggled working even with her employer's accommodations). From March to August 2014, she worked the front desk at a doctor's office, checking patients in and out of their appointments, but resigned because she still suffered pain and dizziness that made it too difficult for her to work. AR 64-65, 328, 1302. After quitting, she filed the current applications for DI and SSI benefits. AR 19.

Allaire's applications were denied initially and on reconsideration. AR 87-162. The ALJ held a video hearing on May 3, 2017, at which Allaire and a VE testified. AR 56-57. On June 6, 2017, the ALJ issued a written opinion following the familiar five-step process outlined in the regulations[2] to find Allaire was not disabled from September

---

[2] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R.**

2

1, 2014, to the date of the decision, the relevant time period. AR 19-31. The ALJ found that Allaire suffers from the severe impairments of degenerative disc disease, osteoarthritis, fibromyalgia, obesity, migraine headaches, post-concussion syndrome, depression, anxiety, and post-traumatic stress disorder (PTSD). AR 21. At step three, the ALJ determined that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of" a listed impairment. AR 22. The ALJ did not specifically analyze the applicability of Listing 12.15, even though Allaire's attorney had asked the ALJ to consider that Listing at the hearing. AR 22-23, 60. The ALJ did, however, specifically address other listings that contain similar requirements to Listing 12.15. AR 22-23.

To evaluate whether Allaire's impairments prevented her from performing her past work (step four) or other work (step five), the ALJ determined Allaire's residual functional capacity (RFC)[3]:

> [T]he claimant has the [RFC] to perform light work . . . except she could lift and carry 20 pounds occasionally and 10 pounds frequently; she could sit and stand or walk 6 hours in an 8-hour workday; she could not climb ladders but could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; she could tolerate occasional exposure to extreme cold, unprotected heights and hazardous machinery; she could perform simple, routine and repetitive tasks requiring no interaction with the public and occasional interaction with coworkers.

AR 24. To determine Allaire's RFC, the ALJ considered the medical opinions in the record (as well as other evidence), assigning little weight to the opinions of Allaire's

---

§§ **404.1520(a)(4), 416.920(a)(4)**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

[3] RFC is "'what the claimant can still do' despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (quoting *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987)).

primary care physician, John Lancaster, MD (AR 28-29); little weight to the opinion of Allaire's treating psychologist, Luke Hansen, PsyD (AR 28); minimal weight to the opinion of one-time consultative examiner Barbara Lips, PhD (AR 27-28); and great weight to the opinions of the nonexamining state agency consultants (AR 29). The ALJ found that Allaire could not perform her past work but that a significant number of jobs existed in the national economy that Allaire could perform (specifically, the ALJ found Allaire could work as a bakery worker, production assembler, or electrical accessory assembler). AR 30-31.

The Appeals Council denied Allaire's request for review on February 27, 2018 (AR 5-7), making the ALJ's decision the final decision of the Commissioner. *See* **20 C.F.R. §§ 404.981, 416.1481**. For good cause shown, the Appeals Council granted Allaire additional time to seek judicial review of the Commissioner's decision (AR 1), making Allaire's complaint timely filed in this court. *See* 20 C.F.R. § 422.210(c). The parties briefed the issues (Docs. 12, 14, 15), and the Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II.    DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." ***Kirby***, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of

those positions represents the [ALJ's] findings, [the court] must affirm the decision." ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

Allaire and the Commissioner dispute whether the ALJ's failure to specifically address Listing 12.15 constituted harmless error. Allaire also argues that the ALJ erred in discounting all the examining-source medical opinions in the record and by failing to include certain limitations in the hypothetical to the VE.

### A. Listing 12.15

During the third step of the disability determination, the ALJ considers whether the claimant's impairment or combination of impairments meets or equals one of the listings of presumptively disabling impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1. **20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii)**. "[A claimant's] impairment[] meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement." **20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3)** (citation omitted). A claimant can equal the listings in one of three ways:

> (1)(i) If [claimant] ha[s] an impairment that is described in [the listings], but—
>
> > (A) [The claimant] do[es] not exhibit one or more of the findings specified in the particular listing, or
> > (B) [The claimant] exhibit[s] all of the findings, but one or more of the findings is not as severe as specified in the particular listing,
>
> (ii) [The Social Security Administration] will find that [the claimant's] impairment is medically equivalent to that listing if [the claimant] ha[s] other findings related to [the] impairment that are at least of equal medical significance to the required criteria.
> (2) If [the claimant] ha[s] an impairment(s) that is not described in [the listings], [the Social Security Administration] will compare [the claimant's] findings with those for closely analogous listed impairments. If the findings related to [the claimant's] impairment(s) are at least of equal medical significance to those of a listed impairment, [the Social Security Administration] will find that [the claimant's] impairment(s) is medically equivalent to the analogous listing.

5

(3) If [the claimant] ha[s] a combination of impairments, no one of which meets a listing, [the Social Security Administration] will compare [the claimant's] findings with those for closely analogous listed impairments. If the findings related to [the claimant's] impairments are at least of equal medical significance to those of a listed impairment, [the Social Security Administration] will find that [the claimant's] combination of impairments is medically equivalent to that listing.

**20 C.F.R. §§ 404.1526(b), 416.926(b)**. "To prove that an impairment or combination of impairments equals a listing, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)).[4]

Allaire argues that the ALJ erred by failing to analyze whether her impairments met or equaled listing 12.15. The Commissioner responds that any error is harmless. The Eighth Circuit has consistently held that "[a]lthough it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion." *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003); *see also Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017); *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822-23 (8th Cir. 2008); *Karlix v. Barnhart*, 457 F.3d 742, 746-47 (8th Cir. 2006). "[R]emand is appropriate [only] where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit [a court] to conclude that substantial evidence supports the Commissioner's decision." *Scott*, 529 F.3d at 822-23 (holding that remand was required when the record contained factual inconsistencies

---

[4] *Sullivan* in turn relied on the following regulatory language: "a claimant's impairment is 'equivalent' to a listed impairment 'if the medical findings are at least equal in severity' to the medical criteria for 'the listed impairment most like [the claimant's] impairment.'" 493 U.S. at 531 (alteration in original) (quoting **20 C.F.R. § 416.926(a)** (1989)). The essentials of this regulatory language remain in effect today: "What is medical equivalence? [A claimant's] impairment(s) is medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment." **20 C.F.R. §§ 404.1526(a), 416.926(a)**.

that the ALJ failed to resolve). Thus, even if the ALJ erred in failing to address Listing 12.15, remand is not required if the record shows Allaire's impairments did not equal that Listing.

Listing 12.15, which governs "trauma- and stressor-related disorders," requires that a claimant's impairments meet or equal "paragraph A" criteria, as well as meet or equal either "paragraph B" or "paragraph C" criteria. **20 C.F.R. pt. 404, subpt. P, app. 1 § 12.15**. Although the ALJ did not specifically analyze Listing 12.15, the paragraph B and paragraph C criteria of Listing 12.15 are the same as the paragraph B and paragraph C criteria of the listings that the ALJ did specifically analyze: Listings 12.04 ("depressive, bipolar, and related disorders"), 12.06 ("anxiety and obsessive-compulsive disorders"), and 12.08 ("personality and impulse-control disorders"). *Id.* §§ **12.04, 12.06, 12.08, 12.15**. Thus, even if the ALJ had considered Listing 12.15, the ALJ would have determined that the claimant's impairments neither met nor equaled that Listing, as the ALJ determined (in connection with her analysis of other listings) that the claimant's impairments satisfied neither the paragraph B nor the paragraph C criteria, without which a claimant's impairments cannot meet or equal Listing 12.15.

Allaire argues that the ALJ's analysis of the applicability of the paragraph B criteria is not supported by substantial evidence.[5] Doc. 12 at 5-10. Paragraph B requires:

> Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
> 1. Understand, remember, or apply information.
> 2. Interact with others.
> 3. Concentrate, persist, or maintain pace.
> 4. Adapt or manage oneself.

---

[5] Allaire states that "the ALJ fail[ed] to adequately evaluate the 'C' criteria under Listing 12.15," but offers no further argument regarding that requirement, not even in response to the Commissioner's footnote that "Plaintiff has not contested [the ALJ's paragraph C] finding, nor . . . put forth evidence that she otherwise met Listing 12.15(C)." *See* Doc. 12 at 5-10; Doc. 14 at 8 n.2; Doc. 15. From my review of the record, the ALJ's paragraph C analysis is supported by substantial evidence, and I decline to address it further given the lack of argument from Allaire.

**20 C.F.R. pt. 404, subpt. P, app. 1 § 12.15(B)** (citations omitted). The ALJ found that Allaire had moderate limitations in the first three categories and mild limitations in the last category. AR 22-23.

Allaire's argument primarily focuses on the first and third categories, but I will briefly address the other criteria. With regard to interacting with others, the ALJ noted that Allaire is "able to shop, attend her grandson's t-ball games, go to the mall[,] and have friends over." AR 23. Treatment notes do not reflect complaints related to interacting with people (other than complaining of feeling detached from people at her first appointment with Dr. Hansen), and providers routinely noted good eye contact and rapport. AR 1261, 1530-39, 1555-84, 1836, 1847. As for adapting or managing oneself, the ALJ recognized that Allaire's daughter reported she did not handle changes in routine very well. AR 23; *see* **20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(E)(4)** (adapting to changes is a factor to consider when determining claimant's adaptive functioning). But the ALJ relied on Allaire's ability to make meals, do laundry, care for her cats, and care for her young grandson at times. AR 23. In addition, providers routinely noted Allaire was well groomed and maintained appropriate personal hygiene. AR 963, 1187, 1200, 1261, 1267, 1530-39, 1555-84; *see* **20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(E)(4)** ("maintaining personal hygiene and attire appropriate to a work setting" is a factor to consider in determining adaptive functioning). Treatment records do not reflect greater than mild limitations in Allaire's ability to adapt or manage herself. Substantial evidence supports the ALJ's determination that Allaire suffered no more than moderate limitations in interacting with others and in adapting or managing herself.

### 1. Understanding, Remembering, or Applying Information

The regulations give the following (nonexhaustive) examples of understanding, remembering, or applying information:

> Understanding and learning terms, instructions, procedures; following one-
> or two-step oral instructions to carry out a task; describing work activity to

8

someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions.

**20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(E)(1)**.  The ALJ noted that in April 2015, Allaire's daughter wrote a letter stating that Allaire has trouble remembering things that her daughter tells her to do and that her forgetfulness and word usage seem to be getting worse.  AR 23, 996.  The ALJ also recognized that Dr. Hansen, Allaire's treating psychologist, routinely noted at therapy sessions (spanning June 2015 to March 2017) that Allaire reported that her short-term memory was impaired (Dr. Hansen also routinely noted fair judgment).  AR 23, 1530-39, 1555-84.  But the ALJ also noted that at Allaire's initial appointment with Dr. Hansen in February 2015, Dr. Hansen's objective examination found Allaire's memory appeared intact (and her judgment adequate).  AR 26, 963.  The ALJ also pointed to the opinion of consultative examiner Barbara Lips, PhD, a licensed psychologist, who administered several objective tests to Allaire in November 2014 and concluded that Allaire "appears able to remember and understand at least simple instructions, procedures, and locations" (although Dr. Lips ultimately concluded that Allaire's issues with "maintain[ing] attention, concentration, and pace" would prevent her from carrying out instructions).[6]  AR 23, 935-36.

Although several treatment notes reflect that Allaire reported memory issues or suffering from forgetfulness, the vast majority of Allaire's treatment records make no mention of her memory issues.  Moreover, when Allaire elaborated on her memory issues, she made it seem like she struggled with finding the right word to use (as opposed with struggling to remember instructions or procedures).  *See* AR 982 (April 2015: reported that she had difficulty with "comprehension and finding the right words" and

---

[6] Dr. Lips found Allaire more limited than the ALJ in concentrating, persisting, and maintaining pace, but that is a separate "paragraph B" criterion, distinct from understanding, remembering, and applying information.  Contrary to Allaire's argument otherwise, Dr. Lips's opinion in the latter category supports the ALJ's finding of only moderate limitations.

9

that she "walked away from her last job [working front desk at doctor's office] because of these memory problems and having problems 'seeing the computer'" (emphasis omitted)); AR 1530 (June 2015: reported continuing to struggle with forgetfulness); AR 1202 (August 2015: reported memory issues where it is hard to remember words and she has difficulty finding words). She denied memory loss in October 2014. AR 1330. She also reported to providers in September 2015 and April 2016 that she had no learning barriers (in the context of providers giving her treatment instructions). AR 1176-78, 1199. Providers other than Dr. Hansen routinely noted Allaire's judgment was normal. AR 963, 970, 1218, 1261, 1267, 1269, 1595, 1836, 1847, 2077; *see also* AR 1200 (noting judgment reasonable in context of insight, which provider found reduced). And when providers evaluated memory as part of their objective examination, they found no impairment. *See* AR 987, 1261, 1267. Substantial evidence supports the ALJ's finding that Allaire suffered no more than moderate limitations in understanding, remembering, or applying information (and Allaire's pointing to treatment records in which she complained of PTSD symptoms or poor sleep does not demonstrate otherwise).

### 2. Concentrating, Persisting, or Maintaining Pace

The regulations list examples of concentrating, persisting, or maintaining pace as:

> Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

**20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(E)(3)**. The ALJ noted that Allaire "has been able to display intact concentration and memory at times" and found that she suffered only moderate limitations in concentrating, persisting, or maintaining pace. AR 23, 26-27. Treatment records reflect that in December 2014, March 2015, April 2015,

January 2016, and March 2016, Allaire reported difficulties concentrating, but that in March, September, and October 2016, she denied such problems. *See* AR 970, 1434, 1527, 1704, 1734, 1969, 2066, 2077. Dr. Hansen noted concentration appeared intact at Allaire's first appointment in February 2015, but after that, consistently noted limited concentration in his objective examinations spanning June 2015 to March 2017. *See* AR 962, 1530-39, 1555-84. When other providers evaluated her concentration, they found it fair and (once) normal. *See* AR 984, 1261, 1267, 1269. Consultative examiner Dr. Lips, Dr. Lancaster, and Dr. Hansen all opined that Allaire's difficulties concentrating would interfere with her ability to perform simple work tasks (although Dr. Lancaster's opinion appeared based on Allaire's bouts of dizziness and migraines, which will be discussed further below). *See* AR 935-36, 1174, 1588, 2105. Providers routinely noted normal thought processes or logical thought content (*see* AR 953, 970, 1218, 1261, 1267, 1269, 1332, 1530- 1540, 1555-1584, 1595, 1654, 1705, 1836, 1953, 2044, 2077; *but see* AR 1200 (September 2015 psychiatric treatment records from the Mayo Clinic indicate "notable for significant circumstantial thought form")). ***See Schwandt v. Berryhill***, 926 F.3d 1004, 1012 (8th Cir. 2019) (holding that claimant's allegation of "trouble concentrating during conversations" was inconsistent with "psychologists' observations that [claimant] was capable of normal, organized thought processes"). Even if the ALJ should have found Allaire markedly limited in concentrating, persisting, or maintaining pace, the record does not support extreme limitations in this category (and substantial evidence supports the ALJ's determination of no more than moderate limitations in the other categories). Substantial evidence supports the ALJ's determination that Allaire's impairments do not meet or equal the paragraph B criteria. Any error by the ALJ in failing to explicitly analyze Listing 12.15 was therefore harmless.

### B. Medical Opinions

When determining a claimant's RFC, the ALJ considers "medical opinions . . . together with the rest of the relevant evidence." **20 C.F.R. §§ 404.1527(b), 416.927(b)**. "The ALJ must give 'controlling weight' to a treating [source's] opinion if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007)); *see also* **20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)**. "Although a treating physician's opinion is usually entitled to great weight, it 'do[es] not automatically control, since the record must be evaluated as a whole.'" *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) (alteration in original) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "Whether the ALJ gives the opinion of a treating [source] great or little weight, the ALJ must give good reasons for doing so." *Id.* The ALJ considers the following factors to determine the weight to assign a medical opinion:

> (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

*Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current **20 C.F.R. §§ 404.1527(c), 416.927(c)**).

The ALJ assigned little weight to the mental RFC opinions of consultative examiner Dr. Lips and treating psychologist Dr. Hansen. AR 27-28. The ALJ also assigned little weight to the physical RFC opinions of Allaire's primary care physician, Dr. Lancaster. AR 28. Instead, the ALJ relied on the opinions of the nonexamining state agency consultants. AR 29. Allaire challenges the weight the ALJ assigned the medical opinions.

12

### 1. Dr. Hansen's and Dr. Lips's RFC Opinions

Allaire's treating psychologist, Dr. Hansen, submitted an RFC opinion dated March 2017. AR 1586-1588. He opined that Allaire suffered marked limitations in understanding, remembering, or applying information; interacting with others; and adapting or managing herself; and extreme limitations in concentrating, persisting, or maintaining pace. AR 1587. Dr. Lips also issued an RFC opinion after a consultative examination in November 2014. AR 932-36. Dr. Lips opined:

> [Allaire] appears able to remember and understand at least simple instructions, procedures, and locations, but regardless of medical substantiation of physical health problems, she would be unlikely to maintain attention, concentration, and pace in order to carry out instructions. She would be unlikely to interact appropriately with supervisors, coworkers, and the public. Her ability to use good judgment and respond appropriately to changes in the workplace would likely depend on her motivation to do so.

AR 935-36. The ALJ found these opinions inconsistent with the record as a whole, pointing to Allaire's activities of daily living, in which she appears to have no trouble going to places where she will have to interact with other people, as well as the treatment records, which did not reflect marked and extreme limitations in many areas of mental functioning (outlined in the previous section on Listing 12.15). AR 27-28. The ALJ's reasoning is supported by substantial evidence (for the same reasons as discussed in connection with Listing 12.15). The ALJ could "give[] less weight" to Dr. Hansen's and Dr. Lips's opinions because "they are inconsistent with the record as a whole." *Stormo v. Barnhart*, 377 F.3d 801, 805-06 (8th Cir. 2004); *see also Schwandt*, 926 F.3d at 1011 ("The results of a claimant's medical examinations and the claimant's reported daily activities can undermine a treating physician's opinion.").

### 2. Dr. Lancaster's RFC Opinions

Allaire's primary care physician, Dr. Lancaster, submitted two RFC opinions, one dated August 2015 and one dated May 2017. AR 1170-75, 2101-06. In both opinions,

Dr. Lancaster opined that Allaire could sit for two hours before needing to stand, but that she could only stand or walk for fifteen minutes at a time and for a total of less than two hours in a day; that she would need to take unscheduled breaks due to dizziness; and that she would miss work more than four times a month. *Id.* The ALJ gave the following explanation for discounting Dr. Lancaster's August 2015 opinion:

> Dr. Lancaster's assessment is given little weight as it is inconsistent with the record as a whole including his own treatment records. For instance, the claimant had minimal treatment around the time of his assessment. He did see her a few months after the assessment and his objective exam at the time revealed mild tenderness over the lower lumbar spine and a negative straight leg raise bilaterally. Those findings are not supportive of his assessed limitations. As fully discussed [elsewhere in the opinion], Dr. Lancaster's assessment is not fully supported by the evidence of record.

AR 28.

An ALJ cannot discount a treating physician's RFC opinion based on a finding of inconsistency with one treatment note; rather, opinions from treating sources may be "given less weight if they are inconsistent with *the record as a whole*." **Stormo**, 377 F.3d at 805-06 (emphasis added); *see also, e.g.,* **Pates-Fire v. Astrue**, 564 F.3d 935, 944 (8th Cir. 2009) (holding that the ALJ could not discount a treating physician's RFC opinion based on an alleged inconsistency with one Global Assessment of Functioning (GAF) score of 58; rather, the ALJ had to consider the claimant's "total GAF score history," which demonstrated only four out of twenty-one GAF scores above 50). Thus, to the extent the ALJ discounted Dr. Lancaster's RFC opinion based on an inconsistency with a treatment note from November 2015 (*see* AR 1868), that is not a good reason for discounting a treating-source opinion. In addition, the ALJ appeared unaware of several treatment notes from Dr. Lancaster from closer in time to his August 2015 opinion than the one cited by the ALJ. *See* AR 1452 (June 26, 2015 office visit with Dr. Lancaster); AR 1846 (October 27, 2015 office visit with Dr. Lancaster). Moreover, contrary to the ALJ's suggestion that Allaire received "minimal treatment" around August 2015, Allaire

14

received treatment from the Mayo Clinic in August, September, and October 2015 for her dizziness and other symptoms at Dr. Lancaster's referral. *See* AR 1195-1206.

The ALJ discounted Dr Lancaster's May 2017 RFC opinion "for the reasons previously stated" in connection with the ALJ's analysis of Dr. Lancaster's August 2015 opinion. AR 29. The ALJ also noted that "the most recent objective records revealed minimal to no objective findings of pain" and that Allaire's fibromyalgia was well-controlled. AR 29. Although substantial evidence supports the ALJ's determination that with treatment, Allaire's neck and back pain improved such that it was not disabling, it appears Dr. Lancaster's limitations were based primarily on her migraine headaches and dizziness (a symptom of her anxiety and migraines, both severe impairments found by the ALJ). *See* AR 1174, 2105.

When viewing Dr. Lancaster's treatment records in totality, substantial evidence does not support that his opined limitations are inconsistent with his treatment notes. Nor are they inconsistent with the record as a whole. On September 5, 2014, Allaire visited Dr. Lancaster to follow-up after going to the emergency room for dizziness a few days prior. AR 879. Allaire reported feeling "somewhat better" but was still suffering from dizziness. AR 879. She also reported visiting an optometrist to see if a problem with her eyes could be causing her dizziness. AR 879. At visits in October and November 2014, Allaire primarily complained of fibromyalgia pain, although she responded positively for dizziness in the review of systems. AR 1330, 1346. In December 2014, she reported frequent dizziness and headaches that had not improved with treatment, and she stated that she had no follow-up appointments with neurology (her last appointment with her neurologist had been in September 2014, and he had recommended an occipital nerve block from the pain clinic and noted he suspected she would have her post-concussion symptoms for years). AR 923, 969.

In January 2015, Allaire reported to Dr. Lancaster that she was still suffering from migraines and dizziness; Dr. Lancaster noted she attributed these symptoms to post-concussive syndrome, but her brain imaging scans were clean. AR 972-73. She did not

15

see Dr. Lancaster again until April 2015, at an appointment where she primarily complained of back pain, although she did respond positively for weakness and light headedness. AR 1411. Dr. Lancaster referred her to an appointment with a specialist, and when Allaire complained of dizziness—including a time that she fell due to dizziness and had to hold on to the wall to stabilize herself—the specialist counseled Allaire that she had to stop thinking of her condition as being caused by post-concussive syndrome, instead recognizing her dizziness and headaches as somatic and caused by her mental health. AR 982-85. Later in April 2015, at an appointment with Dr. Lancaster, Allaire denied symptoms of dizziness, but continued to complain of poor sleep, headaches, and pain. AR 1434-36.

At her June 2015 appointment with Dr. Lancaster, Allaire primarily complained of dizziness. AR 1459-60. She reported continuing "to have trouble with dizziness"; that "[t]oday[,] she woke up with it[,] but it can happen at any time during the day"; that she feels light-headed and like the room is spinning; and that she had been "documenting each day how she feels." AR 1459. She stated that the prescribed Valium (generic name diazepam) "helped intermittently." AR 1459. She also complained of more frequent and intense headaches, occurring several times a week, and stated she had been using prescribed medications and a heating pad in an attempt to treat them. AR 1459. Dr. Lancaster continued her medications (including Valium) and referred Allaire for treatment at the Mayo Clinic. AR 1460.

In early August 2015, Allaire had her first appointment at the Mayo Clinic on Dr. Lancaster's referral. AR 1202-06. She reported cyclical spells of migraines and dizziness. *Id.* The neurologist recommended Botox if she could get it approved by her insurance and a nerve block injection on her right occipital greater nerve. AR 1206. Later in the month, at an office visit with Dr. Lancaster to check her blood for her prescribed use of warfarin (a blood thinner), she reported "her baseline dizziness." AR 1496. She had a psychiatric consultation at the Mayo Clinic in September 2015, in which she reported worsening headaches and dizziness. AR 1196. She also stated that her

16

dizziness was worse with movement around her. *Id.* The psychiatrist prescribed Cymbalta, which Allaire had taken before, and recommended that Allaire continue her psychotherapy sessions. AR 1200-01. The psychiatrist noted that it was unclear whether Allaire's dizziness met features of persistent postural-perceptual dizziness but that this issue could be reevaluated once Allaire's mental health was better controlled. *Id.* The psychiatrist further noted Cymbalta could help improve Allaire's dizziness symptoms, as well as her mental health. *Id.* A few weeks later, in October 2015, Allaire returned to the Mayo Clinic for a neurology appointment. AR 1195. Allaire reported that since receiving the Botox injections, she had "two weeks of well-being, then a migraine," and that she had only suffered three migraines since the last injection. AR 1195. She still complained of dizziness, however, despite normal magnetic resonance imaging (MRI) results of the brain. AR 1195. The neurologist further noted a normal audiology test (measuring whether a problem with Allaire's ears was causing her dizziness). AR 1195. The neurologist recommended repeating the Botox injection in two weeks. AR 1195.

A few weeks later, on October 27, 2015, Allaire followed up with Dr. Lancaster for her dizziness. AR 1876. He noted that the ears, nose, and throat evaluation and two brain MRIs did not reveal what was causing Allaire's dizziness and that a provider at the Mayo Clinic had believed Allaire's anxiety was contributing to her dizziness. AR 1846. Allaire reported using Valium as needed, which "seem[ed] to help," and that her dizziness had worsened on the Cymbalta prescribed by the Mayo Clinic provider. AR 1846. Dr. Lancaster continued her prescriptions for Cymbalta, Valium, and promethazine for dizziness, and decreased her dosage of gabapentin for pain, because it could be contributing to Allaire's morning vertigo. AR 1848.

Shortly thereafter, on November 9, 2015, Allaire presented to the emergency room complaining of back pain and dizziness. AR 1215. She denied suffering from any headaches. AR 1215. She reported that decreasing her gabapentin and restarting Cymbalta exacerbated her vertigo. AR 1215. She was discharged for outpatient treatment in stable condition with no "seriously abnormal test results" and good social

17

support (her husband was present with her in the emergency room). AR 1219. The next day, she followed up with Dr. Lancaster and reported worsening dizziness, particularly when she went to the emergency room. AR 1866. She stated she had been taking Valium twice a day, which helped. AR 1866. Dr. Lancaster instructed her to make another appointment at the Mayo Clinic and decreased her Valium dosage. AR 1867.

On November 20, 2015, a psychiatric nurse practitioner decreased Allaire's Cymbalta dosage and added sertraline (trade name Zoloft) due to her complaints of dizziness. AR 1257. Dr. Lancaster's treatment notes from November 23, 2015, reflect he was aware of this fact. AR 1891. At that appointment, Allaire reported frequent dizziness episodes and that motion seemed to cause dizziness, but that overall, she was feeling better on the decreased Cymbalta dosage. AR 1891. Dr. Lancaster noted she appeared frustrated by her ongoing dizziness problems. *Id.* He continued her current dosages of Cymbalta and sertraline and decreased her gabapentin dosage. AR 1892.

On November 27, 2015, Allaire received occipital nerve injections at the Mayo Clinic. *See* AR 1186, 1904. Afterward, she went out to eat at a pizza restaurant with her family and shopping for Black Friday, and when she went to the bathroom, she ended up tripping, falling, and hitting her head on the floor, and she had to go to the emergency room.[7] *See* AR 1186, 1264, 1904. She told providers that she had not taken sertraline that day due to the nerve injections and that she had been suffering "mild vertigo" for the past two days. AR 1186. The following Monday, she visited Dr. Lancaster, primarily complaining of back pain after her fall, although she also noted she continued to suffer from headaches and dizziness. AR 1904. She visited Dr. Lancaster for back pain again on December 5 and noted that her chronic dizziness had been better the past week. AR 1918. She participated in physical therapy to help improve her back pain.

---

[7] I note that the ALJ relied on Allaire's Black Friday shopping as an activity of daily living inconsistent with disabling limitations, without recognizing that it resulted in a trip to the emergency room. AR 27.

AR 1905, 1925, 1933. She continued to complain of back pain as a result of her Black Friday fall through early January. *See* AR 1264, 1555, 1925, 1952.

She also reported worsening headaches as a result of the fall in mid-December 2015 at an appointment with her psychiatric nurse practitioner, who discontinued sertraline and lowered her Cymbalta dosage at Allaire's request. AR 1264, 1268. Allaire stated that sertraline caused grogginess and that she was not having vertigo until increasing her Cymbalta dosage a few months ago. AR 1268, 1934. The provider questioned Allaire's ability to drive given her vertigo, and Allaire confirmed she was having her husband drive her around. AR 1268. The next day, at an appointment with Dr. Lancaster, Allaire reported that her dizziness waxed and waned, lasting anywhere from two hours to two days, and that "overall, she feels this problem is better currently," and she was taking Valium as needed. AR 1934.

On January 5, 2016, at an appointment with Dr. Lancaster, she reported more frequent headaches since her fall, which were sometimes (but not always) relieved with abortive prescription migraine medication. AR 1952. Dr. Lancaster also noted frequent, intermittent dizziness related to anxiety and improved by Valium, and he decided to taper down Allaire's Cymbalta dosage since it did not seem to help either her mental health or her dizziness. AR 1952. She returned to Dr. Lancaster on January 19, 2016, with flu-like symptoms, and during the course of the appointment, reported dizziness and a "bad headache" at the beginning of the week that had tapered into a "dull headache" currently. AR 1969. At her regularly scheduled appointment two days later, she continued to suffer flu-like symptoms, and she also reported more dizziness than normal that was not improved by Valium. AR 1981. She was feeling better at her appointment with Dr. Lancaster on January 25, 2016, but still suffering "baseline" dizziness and a mild headache. AR 1995.

At a psychotherapy appointment on February 1, 2016, she noted continuing to struggle with vertigo, although it had become less severe since discontinuing all antidepressants. 1558. She also expressed frustration at her husband tracking mud onto

19

floors she had just cleaned, because cleaning the floors often resulted in pain and increased vertigo for her. AR 1559. She continued to primarily complain of dizziness at an office visit with Dr. Lancaster on February 5, 2016, and he noted that her dizziness seemed to have gotten worse since her Black Friday fall. AR 2012. She returned to Dr. Lancaster on February 18, 2016, with a cough and a dizziness flare up, and he noted her dizziness was uncontrolled and prescribed a trial of Effexor. AR 2020, 2027-28. Effexor caused daily headaches so severe that Allaire received an injection to try to relieve them (and Dr. Lancaster noted her headaches had previously been well-controlled). AR 2043. She continued to complain of dizziness at an appointment with Dr. Lancaster on February 25, 2016. AR 2043. He did not prescribe any medications to relieve dizziness but started Allaire on a trial of Tramadol as needed for her headaches. AR 2045.

At an appointment in early March 2016 with Dr. Lancaster, Allaire reported that Valium had become "somewhat ineffective" in improving her dizziness symptoms. AR 2058-59. She noted, however, that over-the-counter dimenhydrate was "working better than anything else" to improve her dizziness and did not cause side effects. AR 2059. She still reported suffering from moderately severe daily dizziness symptoms, exacerbated by movement in her visual field—she gave the example of suddenly feeling dizzy after seeing another car pass while sitting in a car. AR 2058. Dr. Lancaster did not prescribe any new medication since Allaire had an upcoming appointment at the Mayo Clinic, although he instructed her to continue taking dimenhydrinate as needed. AR 2061. A few days later, Dr. Hansen, Allaire's psychotherapist, noted Allaire was discouraged and frustrated by her increasingly problematic vertigo. AR 1561.

Allaire returned to a neurologist at the Mayo Clinic on March 21, 2016. AR 1180. She reported noticing a cyclical pattern where she suffered migraines, then developed vertigo lasting one to two months (but no longer suffering migraines), then felt better for a few weeks until suffering from another headache, and the pattern started anew. AR 1180. The neurologist noted in the past, Allaire had multiple normal test results, including MRIs, an audiogram, a videonystagmography test, eye examinations from an

20

optometrist, and ear examinations from an ear, nose, and throat doctor. AR 1181. The neurologist concluded that Allaire's "vertigo attacks likely represent vestibular migraine" and that her daily dizziness and unsteadiness form the syndrome of persistent postural-perceptual dizziness. AR 1182. He noted persistent postural-perceptual dizziness was treated with antidepressants and anti-anxiety medication that Allaire had not tolerated well in the past. AR 1182. She was referred to a neurology specialist, who suggested she restart sertraline and start using a nerve stimulator to treat migraines. AR 1179. The neurologist also suggested vestibular therapy. *See* AR 1564.

Allaire reported back to Dr. Lancaster on March 25, 2016, who noted he had not yet seen the treatment notes from Allaire's recent visit to the Mayo Clinic (but suggesting that he would review those notes). AR 2069. He noted multiple somatic complaints and that Allaire continued to complain of frequent episodes of dizziness. AR 2069. He declined to prescribe sertraline at that time because he wanted to investigate the nerve stimulator suggested by the Mayo Clinic neurologist. AR 2078.

On April 1, 2016, Allaire had another appointment at the Mayo Clinic. AR 1176. She reported that vestibular physical therapy made her dizziness symptoms worse. *Id.* She continued to complain of dizziness, mildly swaying on balance tests and losing her balance when asked to stand on one leg for ten seconds. AR 1177. Vestibular tests for vertigo were also positive. AR 1177. She was diagnosed with persistent postural-perceptual dizziness syndrome and given home exercises to do for vertigo. AR 1177. She was also restarted on sertraline. AR 1590.

At a psychotherapy appointment with Dr. Hansen on April 25, 2016, Allaire reported continuing to suffer from regular migraines and vertigo. AR 1567. She noted she had felt better for a day and a half recently while helping her daughter, and Dr. Hansen encouraged her to participate in more "light but meaningful" activity, noting that an improvement in mood might correlate with an improvement in her dizziness and migraine symptoms. AR 1568. The next day, at an appointment with Dr. Lancaster, she reported that her migraines had been "fairly well controlled recently," occurring less

21

than once a week, and that she continued to suffer dizziness that waxed and waned in severity. AR 1594. Dr. Lancaster increased her sertraline dosage and noted that she should obtain the nerve stimulator recommended by the Mayo Clinic when able to afford it. AR 1596.

At a follow-up appointment with Dr. Lancaster on June 1, 2016, she reported the increased dosage of sertraline had substantially dissipated her dizziness. AR 1610. Her migraines were increasing in frequency, however, which she attributed to the onset of summer. AR 1612. Dr. Lancaster instructed her to keep a migraine journal to help her determine triggers for her migraines. AR 1613. She continued to report well-controlled dizziness and stable migraines at appointments throughout June 2016, and she stated she felt well enough to kick a ball around with her grandson during this time. AR 1570, 1572, 1654. By August 2016, her dizziness symptoms had returned, which she reported to Dr. Lancaster. AR 1674. She also reported suffering from headaches several times a month. *Id.* He instructed her to continue to work on insurance approval for the nerve stimulator and to return to the Mayo Clinic for occipital nerve block injections. AR 1676.

At an appointment with Dr. Lancaster on September 16, 2016, Allaire continued to complain of worsening and more frequent dizziness, aggravated by having to take care of her young grandson by herself. AR 1704. Dr. Lancaster prescribed Xanax twice daily. AR 1705. Four days later, Allaire returned, complaining of severe dizziness that started September 17 and caused her to "fall[] into walls." AR 1718. Dr. Lancaster discontinued Xanax and instructed her to just use Valium and sertraline. AR 1719, 1735. She reported her dizziness symptoms were improving (but still there) at her appointment with Dr. Lancaster in early October 2016. AR 1733. She also noted the Mayo Clinic had called and instructed her to take Effexor, but she refused due to the side effects it had caused (severe headaches). AR 1733, 2043. Later in October, she continued to report episodes of debilitating dizziness, but she noted the sertraline had helped more than anything else had. AR 1753.

She did not complain of dizziness from November 2016 to early February 2017, and she told Dr. Lancaster in December 2016 that she was not having a problem with dizziness currently. *See* AR 1220, 1764, 1790, 1805, 1823, 1835. She did have to go to the emergency room for an injection to relieve a migraine, however (AR 1576), and Dr. Lancaster referred her to a neurologist for her migraines, who recommended a sodium channel blocker (AR 2095-96).

When viewed as a whole, substantial evidence does not support the ALJ's conclusion that Dr. Lancaster's treatment records are inconsistent with his RFC opinions. During the relevant time period, Allaire saw Dr. Lancaster almost every month, and often, multiple times a month. Dr. Lancaster also referred Allaire to multiple specialists, and treatment notes reflect he reviewed the specialists' treatment notes. *See* AR 2069. Although her dizziness and migraine symptoms waxed and waned, most of the time she complained of suffering from dizziness and migraines that would cause her to miss work, to take unscheduled breaks, and suffer the other limitations found by Dr. Lancaster. Moreover, Allaire tried numerous treatments to help improve these symptoms—she went to specialists at the Mayo Clinic multiple times, which required her husband to miss work to drive her for treatment in a different city, imposing a financial drain on her family (AR 1564); she tried numerous prescription and over-the-counter medications for dizziness, anxiety, and migraines; she participated in vestibular physical therapy; she received occipital nerve block and Botox injections; she received psychotherapy; and she received treatment from neurologists; an optometrist; and ear, nose, and throat doctors.

I recommend finding that the ALJ did not give good reasons for discounting Dr. Lancaster's treating-source opinion. I further recommend that the district court remand for an award of benefits, as the record "overwhelmingly supports" a finding of disability, as outlined by the treatment records in this section. *See **Buckner v. Apfel***, 213 F.3d 1006, 1011 (8th Cir. 2000); *see also* AR 85 (VE testified that missing more than one day of work per month or taking an additional ten-minute break every two hours would preclude competitive employment for Allaire).

*C. VE Hypothetical*

Allaire argues that the ALJ's hypothetical to the VE should have included a limitation related to the need for breaks. As outlined in the preceding section, I have found that substantial evidence supports Dr. Lancaster's opined limitation related to breaks and that the ALJ did not give a good reason for discounting his opinion. Nevertheless, if the district court disagrees with my reasoning in the preceding section, then the ALJ's hypothetical to the VE would not be cause for reversal. The ALJ's hypothetical included all the limitations the ALJ included in his RFC determination. *Compare* AR 23-24 *with* AR 84-85. This is all that is required. *See Harwood v. Apfel*, 186 F.3d 1039, 1044 (8th Cir. 1999).

## III. CONCLUSION

I recommend that the district court **reverse** the decision of the Social Security Administration, enter judgment in favor of Allaire, and **remand** for an award of benefits.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**ENTERED** this 18th day of July, 2019.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa